## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 16 2017, 6:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Ryan W. Tanselle
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Chandra K. Hein
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Matter of J.S., a Child Alleged to be Delinquent, <br><br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br><br> *Appellee-Plaintiff.* | February 16, 2017 <br><br> Court of Appeals Case No. 32A01-1606-JV-1480 <br><br> Appeal from the Hendricks Superior Court. <br> The Honorable Karen M. Love, Judge. <br> Cause No. 32D03-1604-JD-104 |

**Darden, Senior Judge**

# Statement of the Case

J.S. brings this interlocutory appeal from the juvenile court's order waiving his case to a court with jurisdiction of the charges if committed by an adult. We affirm.

# Issues

J.S. presents the following two issues for our review:

I.   Whether the juvenile court abused its discretion by waiving J.S.'s case to adult court after finding that J.S. is beyond rehabilitation under the juvenile justice system.

II.  Whether the juvenile court abused its discretion by failing to enter specific findings to support its conclusion that waiver was appropriate as being in the best interests of the safety and welfare of the community.

# Facts and Procedural History

J.S. was adopted by his parents. It appears that J.S. started to abuse drugs at an early age and he was in sixth or seventh grade when he first purchased a controlled substance at school. He was adjudicated a delinquent for that offense and placed on probation. After violating the terms thereof, his probationary period was extended by three months. J.S.'s significant substance abuse issues continued. At the age of fifteen, J.S. was sent to an in-patient treatment facility, but he continued to abuse illicit substances after leaving that facility.

[4]     J.S. has refused to live at home with his parents. In particular, he has a strained relationship with his mother, frequently yelling, screaming, and cursing at her. While living at home, he would lock himself in his room and refuse to answer her requests to know where he was going and with whom. J.S. also refused to honor his father's rules. J.S.'s parents enrolled J.S. in counseling services, but withdrew him after approximately six to eight months, seeing little to no improvement in their opinion.

[5]     J.S. also refused to attend school and dropped out at the age of sixteen. He was denied re-entry into regular high school due to his poor attitude about school. Instead he enrolled and completed GED classes but failed to take the required test to receive his required GED degree. He also refused to maintain employment. He has had employment at various places, the longest of which lasted two or three months. J.S. also squandered attempts by others to help him improve and change his behavior for the better. J.S. lived with a teacher who offered to tutor him, but moved out after a week because he was not satisfied there. After that, J.S. moved in with a young man who attended church with J.S.'s family. Although the man hoped to serve as a good influence, he had to evict J.S. for his failure to cooperate and pay rent. J.S. then moved in with a friend he knew from one of his previous jobs but left there after a short period of time. J.S. then began living in a motel.

[6]     J.S. has been diagnosed with ADHD and was prescribed medication for that condition. J.S. refuses to take the medication.

[7]     In early 2016, Hendricks County experienced an increase or rash of bank robberies. J.S., who was seventeen, but just four months shy of his eighteenth birthday at the time, watched news coverage of the first robberies and thought he recognized the perpetrator as his friend, Kyle Rhoades. J.S. was even more sure his suspicion was correct when he saw Rhoades with a backpack full of money shortly thereafter. Instead of reporting his suspicions to someone in law enforcement, J.S. sought out Rhoades for information on how he could get involved in committing bank robberies.

[8]     On March 23, 2016, Jelisa Argue reported for work at the PNC Bank in Clayton, Indiana at 8:30 a.m. On that particular day, Argue was the teller at the drive up window and Shannon Herzog was the other teller. During the afternoon, business slowed and the two began to complete some required online training. At 2:30 p.m., two people, later identified as J.S. and his juvenile girlfriend, J.D., entered the bank. Argue had heard someone enter the bank and left her drive-up-window post.

[9]     J.S. was wearing a black toboggan cap, shiny aviator sunglasses, a white shirt, and a Mardi Gras bead necklace. He had gone to great effort to draw a fake tattoo on the side of his neck in order to avoid identification. J.S. placed a note on the counter, pointing toward it when Argue greeted him. Argue read the note which read as follows:

> This is not a game. I want $20,000 cash. Don't move and give
> me everything. If you do what I say everything will be fine. No
> dye packs. Thanks

Tr. pp. 38-39; State's Ex. 1.

[10]     Argue pushed an alarm that she was carrying in her pocket. J.S. then told her not to move. Argue explained that she would have to move because she needed to go to her till (drawer) to retrieve the money. From her till she retrieved what is known as bait money. Bait money is kept in a separate compartment of the till, which, if retrieved, sets off another alarm. The serial numbers of the bait money are recorded. Argue gave J.S. $2,030.00. J.S. asked her if that was all the money she had. After Argue replied that it was, J.S. stared at her for a few moments before he and his girlfriend left the bank.

[11]     Argue later testified that although the incident lasted only a few minutes, she felt it lasted forever. She was scared and nervous because she was uncertain whether J.S. had a weapon. Herzog later testified that she was scared to death and felt very vulnerable because from her position she could not see whether J.S. had a gun and she just happened to see J.D., who was obscured by the counter, at the last moment. After J.S. and his girlfriend left the bank, Argue told Herzog that they had been robbed. They locked the doors of the bank and pulled the alarm. J.S. and J.D. fled the bank, discarding the outer layer of their clothes to evade identification and capture.

[12]     Later, J.S. and Rhoades together decided to rob another bank. They agreed that J.S. would case the bank before Rhoades robbed it. On April 4, 2016, Julie Peters was working as the head teller at First National Bank in Plainfield, Indiana. At around 4:30 p.m., J.S. approached Peters' window and asked

questions about how to transfer an account from Chase Bank to First National. Peters explained the procedures and handed a brochure to J.S., who replied, "cool," and walked away. Tr. pp. 56, 58. As J.S. was leaving, he passed Rhoades in the lobby. J.S. walked to a parked car where J.D. and her two siblings, who were approximately five and two years of age at the time and seated in their booster and car seats, waited for him.

[13] Rhoades was wearing a sweatshirt, hat, and dark sunglasses. As Rhoades began to pull a piece of paper from his pocket, Peters simultaneously pushed an alarm to alert police. The note read: "I want all of your money—I want your money you f***ing bitch. I want all of it." *Id.* at 59. Peters pulled money from her till and laid $2,100 on the counter. Rhoades took the money and left the bank.

[14] Officers received leads about three potential suspects in the robberies. A vehicle matching the description of a getaway vehicle was placed under surveillance. J.S. was in a Kia Soul when officers initiated a traffic stop of it on April 5, 2016. After speaking with his parents about his rights, J.S. admitted to his involvement in two of the four robberies and while doing so implicated Rhoades and J.D. as other participants in some of the four robberies.

[15] On April 8, 2016, the juvenile court authorized the filing of a delinquency petition alleging that J.S. had committed two felonies, one count of Level 5 felony robbery if committed by an adult, and one count of Level 5 felony conspiracy to commit robbery. On April 11, 2016, the State filed a motion to

waive jurisdiction to adult court and requested a hearing on the motion. The hearing was held on April 21, 2016, after which the juvenile court took the matter under advisement. On April 27, 2016, the juvenile court issued findings and conclusions thereon, ordering that J.S.'s charges be waived into a court with adult jurisdiction. Subsequently, the juvenile court certified its order for interlocutory appeal. This Court granted the motion on July 22, 2016, and J.S. now appeals.

## Discussion and Decision

[16] In general, juvenile courts have exclusive original jurisdiction over juvenile delinquency proceedings. Ind. Code § 31-30-1-1 (2012). Under certain circumstances, however, juvenile courts may waive this exclusive original jurisdiction. Waiver of jurisdiction is for the offense charged and all included offenses and is accomplished by an order of the juvenile court waiving the case to adult court. Ind. Code § 31-30-3-1 (1997). The order must include specific findings of fact to support the order. Ind. Code § 31-30-3-10 (1997).

[17] One of the waiver statutes provides that after the State files its motion requesting waiver, and after a full investigation and hearing, the juvenile court may waive jurisdiction upon the finding that:

> (1) the child is charged with an act that is a felony:
>
> (A) that is heinous or aggravated, with greater weight given to acts against the person than to acts against property; or
>
> (B) that is a part of a repetitive pattern of delinquent acts, even though less serious;

(2) the child was at least fourteen (14) years of age when the act charged was allegedly committed;

(3) there is probable cause to believe that the child committed the act;

(4) the child is beyond rehabilitation under the juvenile justice system; and

(5) it is in the best interests of the safety and welfare of the community that the child stand trial as an adult.

Ind. Code § 31-30-3-2 (2008).

[18] Here, J.S. specifically challenges the sufficiency of the evidence supporting the juvenile court's findings under subsections 4 and 5.

[19] Upon appellate review of claims alleging insufficient evidence to support waiver, we will not weigh the evidence or judge the credibility of witnesses. *S.W.E. v. State*, 563 N.E.2d 1318, 1322 (Ind. Ct. App. 1990). We look only to the evidence most favorable to the State and reasonable inferences to be drawn therefrom, considering both the record of the waiver hearing and the reasons given by the court. *Id.*

[20] Unlike criminal proceedings, juvenile proceedings are civil in nature and the burden is on the State to establish by a preponderance of the evidence that juvenile jurisdiction should be waived. *Phelps v. State*, 969 N.E.2d 1009, 1016 (Ind. Ct. App. 2012), *trans. denied.* We review the juvenile court's decision to waive exclusive original jurisdiction for an abuse of discretion. *Id.* The juvenile court is entitled to give the evidence before it whatever weight it deems appropriate. *Id.*

# I. Beyond Rehabilitation

The determination of whether a juvenile is beyond rehabilitation of the juvenile justice system is fact sensitive and can vary widely from individual to individual and circumstance to circumstance. *Jordan v. State*, 62 N.E.3d 401, 405 (Ind. Ct. App. 2016) (citing *Hall v. State*, 870 N.E.2d 449, 457 (Ind. Ct. App. 2007), *trans. denied*), *trans. denied.*

J.S.'s challenge to this finding amounts to an invitation for this Court to reweigh the evidence. The juvenile court found that J.S. admitted to committing a bank robbery and to casing another bank for Rhoades to aid him in his efforts to rob it. J.S.'s probation officer testified that in her experience supervising juvenile offenders, and considering the gravity of J.S.'s offenses— leaving bank tellers fearful that they would not only be robbed, but could face being shot—there were no juvenile services that would help rehabilitate J.S. This was so, she testified, especially since J.S. would turn eighteen years of age within months. She also cited J.S.'s issues with obeying rules at home, dropping out of school, and failing to follow through with his GED test. J.S. failed to cooperate and/or take advantage of offers of help from others who were willing to serve as role models, instead seeking out help in new criminal ventures. Additionally, the record reveals that J.S. has not been able to maintain employment for any significant period of time and has been involved in illicit drug use. We cannot say that the juvenile court abused its discretion by making this finding in support of waiver.

## II. Community Safety and Welfare

[23] Next, J.S. argues that the juvenile court abused its discretion by failing to make specific findings in support of this conclusion. However, upon review of the findings as a whole, there is sufficient evidence to support this conclusion.

[24] J.S. had a prior adjudication as a delinquent. He started abusing drugs at a very early age and purchased controlled substances while at school and violated the conditions of his probation. Rather than learning from that experience, he continued to abuse illicit drugs. Later while watching television news reports of increased bank robberies in the community and being able to determine the identity of the perpetrator, J.S. sought out that person as a mentor to teach him how to commit similar crimes. In one robbery, J.S. frightened two tellers at the PNC Bank in Clayton, Indiana, demanding that they give him money. He even went so far as to enlist the help of his juvenile girlfriend in the commission of his criminal activity. In another incident, he allowed his girlfriend and her two extremely young siblings to wait for him in a car outside the First National Bank while he cased it for Rhoades, who then robbed the bank. We find that there are sufficient, specific findings to support this conclusion.

[25] For argument's sake, assuming, without deciding, even had the waiver order not contained particular, spelled-out facts justifying waiver, that does not invalidate the waiver order. *Vance v. State*, 640 N.E.2d 51, 57 (Ind. 1994). Specific facts need not be recited in the order if the record clearly contains sufficient facts for the court to find that the waiver is appropriate under the circumstances. *Id.*

[26]    In review, it is undisputed that J.S., who had experience with the juvenile system, recognized a friend on television as a person who was a suspect in a bank robbery. Instead of contacting law enforcement, J.S. sought out that friend to learn how he could also commit similar crimes. Afterwards, he went to WalMart to purchase items of clothing and other paraphernalia to disguise himself. Subsequently, he personally placed two tellers at a community bank in fear for their safety when he robbed the bank in Clayton, Indiana. Also, he enlisted the assistance of his juvenile girlfriend in his criminal activity. After the first robbery, he conspired with his mentor, Rhoades, to commit yet another robbery. While he was casing the bank, he allowed his girlfriend, and her two extremely young siblings to wait outside in the car for him. According to J.S., after the robbery, they were then going to take J.D.'s siblings to school. At the time of the incident, J.S. did not know if Rhoades was armed when he entered the bank.

[27]    J.S.'s argument that his parents were willing to have him return to their home under their guidance and structure is an attempt to persuade us to reweigh the evidence. His argument that his parents would provide home-based counseling and GPS monitoring for him is not enough. Evidence shows that for years he has failed to follow the guidance of his parents, to show respect for their home, and has refused to take medication that was prescribed by doctors. Those efforts to provide a structured environment proved unsuccessful in the past and the court was well within its discretion to reject them.

# Conclusion

[28] The trial court did not abuse its discretion when it waived jurisdiction. There was sufficient evidence for the court to find that J.S. is beyond rehabilitation under the juvenile justice system and that it is in the best interests of the safety and welfare of the community that J.S. stand trial as an adult.

[29] In light of the foregoing, the juvenile court's waiver order is affirmed.

[30] Affirmed.

Najam, J., and Bradford, J., concur.